**PEARL MUSIC COMPANY, INC., a corporation, National Music Corporation, a corporation, Market Research Corporation of America, a corporation, Consolidated Industries, Inc., a corporation, Nordest Marketing Group, Inc., a corporation, Joseph J. Martin, an Individual, Plaintiffs,**

v.

**RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC., a corporation, Defendant.**

Civ. A. No. CV 78–1444–AAH (Tx).

United States District Court, C. D. California.

Nov. 15, 1978.

Romney Schaap Golant Scillieri Disner & Ashen and Michael J. Dennis, Beverly Hills, Cal., for plaintiffs Pearl Music Co., Inc., Nat. Music Corp., Market Research Corporation of America, Consolidated Industries, Inc., Nordest Marketing Group, Inc. and Joseph J. Martin.

Mitchell, Silberberg & Knupp, Howard S. Smith and Thomas P. Lambert, Los Angeles, Cal., for defendant Recording Industry Ass'n of America, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAUK, District Judge.

### FINDINGS OF FACT

1. Plaintiffs Pearl Music Company, Inc., National Music Corporation, Market Research Corporation of America, Consolidated Industries, Inc. and Nordest Marketing, Group, Inc. are each corporations. Plaintiff Joseph J. Martin is an individual.

2. Defendant Recording Industry Association of America, Inc. is a corporation.

3. Plaintiff Joseph J. Martin (hereinafter "Martin") commenced doing business as a sole proprietor under the name National Music Company in 1968. In 1972, plaintiff Pearl Music Company, Inc. (hereinafter "Pearl Music") was incorporated by plaintiff Martin and took over the business that was formerly conducted by Martin under the name National Music. Pearl Music also does business under the fictitious name "The Tape Company". National Music Company conducted its business by selling at retail basically the same package which plaintiff Pearl Music is now selling.

4. In 1969, plaintiff Martin began obtaining phonograph records manufactured by commercial record companies, duplicating the sounds recorded on those phonograph records onto cassette tapes, and supplying those duplicated cassettes to his customers.

5. Martin owns all of the stock of Pearl Music and is the president and "boss" of Pearl Music.

6. When plaintiff Martin first started doing business as National Music Company, Martin sold to the public a "package" which consisted of blank cassette tapes, pre-recorded cassettes which contained sounds duplicated or transferred onto them from factory tapes, a catalogue, coupons to be used to purchase blank cassettes and pre-recorded cassettes, and equipment for playing and recording on the tapes. That same basic package is still being sold to the public.

7. Plaintiff Martin has engaged in tape piracy at all of the locations at which he has conducted his business since 1969. At the beginning, pirated cassettes were duplicated one at a time. For the past five or six years, Martin and Pearl Music have hade a "master" pirated cassette by duplicating a commercial record onto a cassette and have used that pirated "master" for duplication of four pirated cassettes at a time for sale to the public. ("Duplicated tape" is synonymous with "pirated tape". The unauthorized duplication of recordings is commonly known as "record piracy" or "tape piracy".)

8. No record company has ever given Martin or Pearl Music permission to duplicate the phonograph records manufactured and sold by that record company.

9. Before plaintiff Martin started to duplicate recordings in 1969, he did not seek the permission or consent of any recording company, or the permission or consent of the owner of any of the copyrights in the songs, performances of which were embodied on the recordings.

10. Some time around February, 1972, Martin received a letter advising him to stop duplicating recordings. Martin did not cease duplicating and did not seek any license from a record company to duplicate its recordings, or send to the owners of the copyrights in the musical compositions (tunes and lyrics) performed on records being duplicated any document necessary even to attempt to comply with the compulsory license provision of the Copyright Act.

11. Pearl Music and Martin have never obtained permission from the owners of the copyrights of the musical compositions embodied on the pirated cassettes manufactured and sold by Pearl Music to manufacture cassettes containing performances of copyrighted songs, and have never paid any fees to any copyright owner.

12. Pearl Music and Joseph Martin have never sent any owner of a copyright in a musical composition a notice of intention to use or a statement under oath reporting the number of cassettes manufactured in a given month. [*See* former 17 U.S.C. §§ 1(e) and 101(e).]

13. Martin and Pearl Music received a letter dated May 19, 1977, from Harry Fox Agency, which represents a number of musical composition copyright owners, requesting information. Martin never replied to this letter or made any attempts to obtain licenses from or pay fees to the owners of copyrights in the musical compositions embodied on the pirated cassettes manufactured and sold by Pearl Music.

14. On September 17, 1975, six record companies filed an action for copyright infringement in this court against Joseph J. Martin individually and doing business as National Music Company and The Tape

Company and against Pearl Music Company, Inc. Subsequently a seventh record company filed a similar action in this court against Joseph J. Martin and Pearl Music Company, Inc. These copyright infringement actions were originally commenced as one action but pursuant to order of this court were refiled and maintained as separate actions by each of seven record companies against Joseph J. Martin individually and doing business as National Music Company and The Tape Company and Pearl Music Company, Inc. These seven actions are: *Capitol Records, Inc. v. Joseph Martin et al.* No. 75–3147–IH, *ABC Records, Inc. v. Joseph Martin et al.* No. 76–0384–IH, *CBS, Inc. v. Joseph Martin et al.* No. 76–0385–IH, *MCA Records, Inc. v. Joseph Martin et al.* No. 76–0028–IH, *Atlantic Recording, Corp. v. Joseph Martin et al.* No. 75–4259–IH, *RCA Records, Inc. v. Joseph Martin et al.* No. 75–4104–IH and *Warner Brothers Records, Inc. v. Joseph Martin et al.* No. 75–3147–IH and are referred to in defendant's motion and herein as the "Consolidated Copyright Infringement Actions." On July 13, 1976, a judgment was entered in the Consolidated Copyright Infringement Actions enjoining Joseph J. Martin and Pearl Music Company, Inc., from infringing any sound recording copyright owned or controlled by any of the seven plaintiff record companies. On October 28, 1977, Joseph J. Martin and Pearl Music Company, Inc., were found guilty of ten counts of contempt for violating that injunction and fined $7,500 compensatory damages and attorneys fees.

15. The first time that plaintiff Martin ever requested a license from a record company to duplicate its recordings was some time in 1975, after commencement of the Consolidated Copyright Infringement Actions. This request was communicated to the attorney representing the seven record companies suing Martin for copyright infringement in the Consolidated Copyright Infringement Actions, in the course of discussions which led to settlement of that action. No record company agreed to grant plaintiff Martin or Pearl Music a license.

16. In 1977, plaintiff Pearl Music unilaterally sent some record companies documents entitled "Compulsory License Notice" which referred to an intention "to use [various] copyrighted musical composition(s) upon parts of instruments serving to reproduce mechanically the said musical work(s), relying upon the compulsory license provision of Section 1(e) of the Copyright Law of the United States." These notices were sent for only part of the selections in the Pearl Music catalogue. Two record companies responded to these "Compulsory License Notices" by demanding that Martin and Pearl Music cease duplicating their recordings, but Pearl Music and Martin did not cease duplicating recordings manufactured and sold by those record companies.

17. These "Compulsory License Notices" were the only documents ever sent by Martin or Pearl Music on the subject of seeking licenses from either record companies or owners of copyrights in musical compositions.

18. The duplicating process used by Martin and Pearl Music takes the sounds which are captured on the vinyl of a commercially available phonograph record and transfers those exact identical sounds to the plastic tape of a cassette. Martin and Pearl Music acquire a phonograph record with the label of a commercial record company on it (sometimes referred to as a "factory tape") and duplicate from that record a cassette which is an exact duplicate of the sounds contained on that record so that when one plays the cassette made by Martin and Pearl Music, one hears the exact sounds embodied on that phonograph record.

19. Plaintiff Martin individually also sells pirated cassettes. The businesses conducted by Ronald J. Morf ("Morf") [plaintiffs Market Research Corporation of America and National Music Corporation which distribute pirated cassettes to the public] deal directly with Martin who in turns pays Pearl Music for the pirated cassettes. Martin, individually, continues to use the name National Music Company. Morf and his companies have been dealers of plaintiff Martin and Pearl Music since 1975, and have had sub-dealers.

20. Since mid-1973, plaintiff Pearl Music has done business only through dealers and not directly to the public. Plaintiff National Music Corporation was, and plaintiff Market Research Corporation of America is, one of those dealers.

21. The product which Pearl Music presently sells is a package which consists of three coupon books, a catalogue, a mailing envelope and a pre-recorded tape which is, in 95% of the cases, a pirated tape. That current catalogue is the same catalogue of Pearl Music dba The Tape Company which existed in March, 1976, except that the prior catalogue contained copyrighted sound recordings all of which have been deleted from the current catalogue. Prior to March, 1976, Pearl Music brought out a new catalogue every year which added selections to the prior year's catalogue. The catalogue is the only document which records and evidences the products which are manufactured and sold by Pearl Music.

22. The Pearl Music inventory consists of all pirated "master cassettes" necessary to make every selection listed in the catalogue and blank cassettes used for that purpose, plus approximately 1,000 pre-recorded cassettes.

23. Over 98% of the recordings shipped to customers out of the Pearl Music catalogue are pirated tapes prepared by duplicating a disc phonograph record which was originally manufactured by a record company. The remaining 2% are record company discards which Martin purchases at "dumps".

24. Pirated cassettes are duplicated by Pearl Music as they are ordered. Pearl Music does not keep, and for the past three or four years has not kept any record of the title of the selections duplicated or of the quantity of duplicates made of any legitimate ("factory") recording. Pearl Music does not keep any inventory records. It would not be possible for anyone to determine the number of cassettes duplicated of any item in the catalogue for the past three or four years.

25. For the period February 1972 through May 1974, Pearl Music kept a list of the number of pirated cassettes that Pearl Music made of record albums which were initially released after February 1972. No record was ever kept of the number of pirated cassettes made of record albums that were initially released prior to February 1972. Neither the record companies nor the owners of the copyrights in the musical compositions were ever notified by Pearl Music of the number of pirated cassettes duplicated, and no fees or other sums were ever paid to any record company or owner of any copyright in any musical composition. Pearl Music ceased keeping such records after the month of May 1974 and after that month, no record was kept of the number of pirated cassettes made of any record album.

26. In any one week, Pearl Music makes at least 125 pirated cassettes to put in packages to send to distributors and sub-distributors for delivery to new customers. In addition, one thousand pirated cassettes are duplicated each week and sent to customers pursuant to orders made from the catalogue.

27. During 1978 Pearl Music has made pirated cassette tapes of more than 100 selections listed in its catalogue. These pirated tapes contain selections by numerous popular recording stars including (but not limited to) Paul Anka, Herb Alpert, Ray Anthony, Joan Baez, The Beach Boys, The Beatles, Blood, Sweat & Tears, Black Sabbath, Chuck Berry, Glen Campbell, Johnny Cash, Vikki Carr, Ray Charles, Perry Como, Sammy Davis, Jr., John Denver, Neil Diamond, The Doobie Brothers, Roberta Flack, Tennessee Ernie Ford, Benny Goodman, Elton John, Kris Kristofferson, Loretta Lynn, Henry Mancini, Montovani, Dean Martin, Johnny Mathis, Elvis Presley, Charley Pride, Helen Reddy, The Rolling Stones, Frank Sinatra, Barbra Streisand, Conway Twitty, Dionne Warwick, Lawrence Welk and Tammy Wynette. In addition, during 1978 Pearl Music has made pirated tapes of "quite a few" classical music albums.

28. Morf owns all of the stock in plaintiff Market Research Corporation of America ("Market Research") and National Music

Corporation and, in addition, is the president, secretary, treasurer, sole officer and sole director of each of those corporations.

29. Morf formed plaintiff National Music Corporation in 1972. Morf has always been the only person with any ownership interest in National Music Corporation. From inception through 1977, Morf was the person in charge of the day-to-day operations of National Music Corporation. From March 1977 to the present, Morf has been and is the person in charge of the day-to-day operations of Market Research. During these times there was no person at either corporation superior to Morf and Morf was and is "the boss". National Music Corporation ceased doing business in March 1977 as a result of a raid by the Federal Bureau of Investigation. The raid was made pursuant to a search warrant issued by a United States Magistrate, which was based on allegations that National Music Corporation was selling tapes that had been unlawfully duplicated.

30. From the time that plaintiff National Music Corporation was started to the time it was closed by the Federal Bureau of Investigation, the business of National Music Corporation was selling stereos, blank tapes, and prerecorded tapes. National Music Corporation bought pirated tapes during the entire time it was in business from National Music Company, Pearl Music and The Tape Company, all of which were owned by plaintiff Martin. National Music Corporation purchased from either National Music Company or Pearl Music or The Tape Company a package containing a blank tape and a prerecorded tape labeled with the name of either National Music Company or The Tape Company, and continuing coupons for purchasing blank tapes and coupons for purchasing prerecorded tapes. These coupons were sold by National Music Corporation to its customers who in turn used them to purchase cassettes from National Music Company, Pearl Music, or The Tape Company. This arrangement by which National Music Corporation started to sell pirated tapes was made by Morf with Martin. Market Research took over as dealers persons who had been dealers for National Music Corporation.

31. Morf worked for Martin prior to starting his own business. While working for Martin, Morf knew that Martin was supplying customers with pirated tapes. Morf has never seen a legitimate factory tape in any of the packages that came from Pearl Music or The Tape Company.

32. Morf believes that all of the recordings that are in the Pearl Music or The Tape Company catalogue are duplicated recordings—that is, recordings made by duplicating a recording made by someone else.

33. So far as Morf knows, Martin's companies, National Music Company, Pearl Music and The Tape Company, always distributed pirated cassettes of recordings which were initially fixed prior to February 15, 1972.

34. Market Research is still in business and sells the same product that plaintiff National Music Corporation formerly sold. Market Research obtains packages from Martin just as National Music Corporation did and the packages contained the same things. The package prepared by Pearl Music came complete in an unmarked brown manila envelope. Market Research sells its product in the same way that National Music Corporation did. Market Research does not sell any other product and is not in any other business. At approximately the time that National Music Corporation went out of the "music business", Market Research went into it. Market Research operates out of the same premises which were used by National Music Corporation.

35. Since March 1977, Market Research has not been involved in direct sales to the public but sells its product through dealers. From March of 1976 to March 1977, Market Research ran a telephone "boiler room" from which consumers were telephoned to solicit them to meet with sales personnel of National Music Corporation. The purpose of the dealers established by Market Research is to sell the product of Pearl Music.

36. Market Research is the agent of plaintiff Martin and of plaintiff Pearl Music. Market Research collects moneys for

Martin, deducts its share, and remits the balance to Martin. There is a written agreement between Market Research and Pearl Music.

37. Market Research acts as agent for Pearl Music in hiring and training persons to open and run dealerships to promote the sale of pirated tapes in a similar fashion as that formerly done by National Music Corporation. The packages (containing a pirated tape, a blank cassette, a catalogue, coupon books and a return envelope) are shipped directly by Martin to the dealers who pay Market Research which in turn pays Pearl Music. The dealers sell the package to consumers.

38. The written agency or distributorship agreement between Pearl Music and Market Research was prepared by Morf. That agreement contains a recital that "all necessary laws have been complied with for the sale, resale and distribution of the prerecorded tapes and that all copyright laws have been complied with, and that the necessary royalties have been paid on the tapes distributed by [Pearl Music]". That recital is false.

39. Martin still distributes pirated tapes through Morf's distributors. Morf or his distributors currently purchase pirated tapes from Martin, Pearl Music or National Music Company. Those pirated tapes carry the label of The Tape Company on them and they do not have the name of a commercial recording company on them. The tapes are also labeled with the name of the performing artist and the title of the selection. As far as Morf knows, Martin is still manufacturing pirated tapes in Huntington Beach, California. Morf last saw Martin's duplicating facilities a week or so prior to his deposition taken in this action.

40. Paul Douglas Nedovich ("Nedovich") started in the "music business" in the spring of 1976 as a sole proprietor doing business as National Music. Subsequently the business was taken over by plaintiff Consolidated Industries, Inc. ("Consolidated") which commenced doing business under the name National Music. Nedovich owns 98% of the stock of Consolidated; his wife and accountant own the remaining stock. After the FBI raid on National Music Corporation in Connecticut in 1977, Consolidated changed the name under which it did business from National Music to Plaza Music & TV.

41. Plaintiffs Consolidated and Nordest Marketing Group, Inc. ("Nordest") were dealers for National Music Corporation and Market Research and subdealers for Pearl Music. Morf trained the employees of Consolidated and Consolidated did business just like Morf's companies. Consolidated always purchased duplicated tapes from Morf's companies. Consolidated bought envelopes containing the Pearl Music catalogue, coupon, duplicated tape and blank tape from Market Research; those packages were delivered by The Tape Company (a fictitious name under which Pearl Music does business).

42. Consolidated always purchased tapes from Morf's companies (Market Research or National Music Corporation). The actual tapes were delivered by The Tape Company.

43. The prerecorded tapes which Nedovich's companies delivered to consumers were duplicated tapes bearing the label of The Tape Company and not "factory tapes" bearing the name of a commercial record company. Morf told Nedovich that the tapes of The Tape Company were made by duplicating a tape or record originally sold by a record company.

44. Save Mart Incorporated is a corporation all of the stock of which is owned by Sound Out Ltd. a holding company the stock of which is owned by Nedovich. Save Mart Incorporated sold the same program purchased from Morf that Consolidated sold. Nordest was incorporated in the fall of 1977. Nedovich engaged in the "music business" through Nordest in Reading, Massachusetts from October 1977 through February 1978 selling the same package that Nedovich's other entities sold, i. e., the package obtained from Pearl Music through Market Research.

45. Wilfred John Funk ("Funk") was an Assistant Attorney General of the State of

New Hampshire from the fall of 1974 until the spring of 1978. During that entire time he was in the Consumer's Division of the Attorney General's office; from 1976 to 1978 Funk was the head of the Consumer's Division of the Office of the Attorney General of the State of New Hampshire. Consolidated Industries, Incorporated, Paul Nedovich, Save Mart Incorporated, Ronald J. Morf, National Music Corporation, National Music Company and Plaza Music & TV came to Funk's attention in 1976 because the Attorney General received consumer complaints. Defendant Recording Industry Association of America, Inc. did not have anything to do with inducing the Attorney General of New Hampshire to commence an investigation of those persons and entities; the investigation was induced by consumer complaints.

46. On August 19, 1977, at a meeting in Funk's office, Funk stated to Morf, Nedovich and others who were present, that their continued operation of business in New Hampshire would violate a penal statute that was going into effect the end of August, 1977, and regardless of what potential consumer problems existed in their sales presentation, their basic operation appeared to be unlawful under that statute. Morf, speaking for Nedovich and the other persons present, stated that it would be unlikely that they could comply with the requirements of the new New Hampshire statute. Funk also gave Morf and Nedovich a list of state laws making record piracy unlawful. Morf, Nedovich and the other persons present stated to Funk that all business activities would immediately cease in the State of New Hampshire and in any and all other states having similar statutes. Funk confirmed this conversation with a letter dated August 19, 1977, which accurately stated what was said in that meeting.

47. As a result of consumer complaints and the ensuing investigation by the office of the Attorney General of the State of New Hampshire, Funk prepared a draft of a petition for injunction which basically states the violations that the office of the Attorney General of New Hampshire per-ceived with respect to the operation of The Tape Company, Pearl Music, National Music Corporation, Consolidated, Save Mart Inc., Martin, Morf and Nedovich. That petition was not filed because the persons named therein ceased doing business in the State of New Hampshire as a result of the meeting with Funk on August 19, 1977.

48. Similar consumer complaints were made against Martin in California and against National Music Company dealers in Kentucky and Maryland. All these complaints resulted in official action and some form of injunction or order.

49. Defendant Recording Industry Association of America has not filed or caused to be filed any "sham" civil litigation against plaintiff and has not engaged in any conduct which has caused any plaintiff to be barred from access to any judicial tribunal.

## CONCLUSIONS OF LAW

From the foregoing facts the court concludes:

1. Plaintiffs Joseph J. Martin and Pearl Music Company, Inc., have since 1969 been engaged in, and now are engaged in duplicating and selling pirated prerecorded tapes. Plaintiffs National Music Corporation, Market Research Corporation of America, Consolidated Industries, Inc., and Nordest Marketing Group, Inc., are now engaged or have in the past been engaged in the sale of pirated tapes duplicated by plaintiffs Pearl Music Company, Inc., and Joseph J. Martin. The manufacture or sale of unauthorized duplicates of commercial records is commonly known as record piracy and tape piracy.

2. Plaintiffs have engaged in the piracy of recordings initially fixed after February 15, 1972 and which were protected by federal copyright and plaintiffs have engaged and are now engaged in the piracy of recordings initially fixed prior to February 15, 1972, which are protected against piracy by the Penal Statutes of 49 states.

3. Plaintiffs Joseph J. Martin and Pearl Music Company, Inc. commenced duplicat-

ing commercial recordings and manufacturing and selling pirated tapes in 1969 without requesting the license or consent of any person entitled to license or consent to the duplication of commercial phonograph recordings. In 1972, plaintiffs Joseph J. Martin and Pearl Music Company, Inc. were put on notice to cease manufacturing and selling pirated tapes but disregarded such notice, did not seek the consent of any record company to duplicate its recordings, and continued to manufacture and sell pirated tapes.

4. Plaintiffs have not obtained any consent, license or authority to duplicate recordings from the owner or owners of the rights in any recordings.

5. Plaintiffs have never sought, and have not obtained the consent, license or authority of any owner of any copyright in a musical composition or musical work to manufacture or sell cassette tape recordings or any other recordings embodying any recorded performance of any copyrighted musical composition or musical work.

6. Plaintiffs have been engaged, and plaintiffs Joseph J. Martin, Pearl Music Company, Inc., and Market Research Corporation of America are now engaged in the criminal violation of the Copyright Act of the United States by duplicating and selling pirated tapes embodying copyrighted musical compositions and musical works, willfully and for profit and gain, without the consent authority or license or any person lawfully entitled to give such consent, authority and license.

7. At the present time, 49 states (every state except Vermont) have in force and effect statutes which make it a crime to duplicate phonograph records without the consent of the owner of the underlying recording and to sell such unauthorized duplications; i. e., statutes which made it a criminal offense to manufacture and sell pirated tapes.

8. Plaintiffs have conducted in the past, and plaintiffs Joseph J. Martin and Pearl Music Company, Inc. and Market Research Corporation of America are now conducting the "business" of manufacturing and selling pirated cassette tapes which are made by the unauthorized duplication of commercial phonograph records without the consent of the owner of the underlying recording. The businesses which plaintiffs have conducted and which are now being conducted by plaintiffs Joseph J. Martin, Pearl Music Company, Inc., and Market Research Corporation of America are illegal and unlawful businesses.

9. Plaintiffs have been engaged, and plaintiffs Joseph J. Martin, Pearl Music Company, Inc., and Market Research Corporation of America are now engaged in violation of the criminal laws of every state in which they manufacture or sell pirated cassette recordings, except the State of Vermont.

10. The operating of plaintiffs' business is in violation of the Copyright Act and the criminal anti-record and tape piracy statutes of forty-nine states.

11. The operation by plaintiffs of their tape piracy business is contrary to the strongly stated public policy of the United States of America and the 49 states that have made it a crime to manufacture and sell pirated tapes. Plaintiffs' record piracy is wrongful with respect to: record companies, including the record company members of defendant Recording Industry Association of America; the owners of the copyrights in the musical compositions (tune and lyrics) performances of which are embodied on the recordings pirated by plaintiffs; the musicians and performers who perform those copyrighted musical compositions; various unions and trust funds established by collective bargaining agreements; the federal government; and local and state governments.

12. Tape piracy of the kind conducted by plaintiffs is fundamentally anti-competitive. Such tape piracy is a form of larceny.

13. Plaintiffs attempts to invoke the compulsory license provisions of the Copyright Act were legally ineffective.

14. Plaintiffs do not have the standing or capacity to maintain this anti-trust action. *Memorex Corp. v. IBM Corp.*, 555

F.2d 1379 (9th Cir. 1977), does not, as plaintiffs argue, foreclose this issue. *Memorex* is readily distinguishable from the case at hand because the plaintiff in that anti-trust action, Memorex Corp., was a business which engaged in wrongful or illegal conduct only in part of its sizeable enterprise. It was the expansion by Memorex beyond the magnetic tape market into IBM's disc storage device market that brought the charges from IBM that Memorex was stealing trade secrets and hiring away key personnel from IBM to further its competitive advantage in that new market. After Memorex sued IBM for anti-trust violations in this market, IBM raised a defense of "illegal market presence" based on those wrongful activities. *Id.* at 1380.

Although the *Memorex* Court discussed this defense in terms of "illegality," neither that case nor *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674 (9th Cir. 1974), present a factual pattern as is present here—that is, one in which the plaintiff is engaged in a business which is, by its very nature, entirely illegal. The almost total magnitude of this illegal conduct by plaintiffs makes their miniscule conduct that may be legal, insignificant, and, in any event, none of such miniscule and possibly legal conduct rises to the level of the legitimate activities of *Memorex* and *Calnetics*. *See* Findings of Fact, Paragraphs 21 and 23.

■ Furthermore, *Memorex* does not foreclose a defense of lack of standing or capacity when the plaintiff's business is totally illegal under the laws of forty-nine states. The *Memorex* Court specifically left open the question of whether a violation of the law could bar an anti-trust action. *See* 555 F.2d at 1382 n.5. The Court limited the scope of that decision to situations in which the wrongful conduct had been directed against the defendant in a private sense, rather than a public wrong caused by massive and all-pervasive violations of the law, as are present here. *Id.* at 1382 & n.5. As the Court noted, "This does not mean that any violation of a law by a plaintiff will not bar an action. . . .

What we are holding today is that wrongs against the defendant, such as the theft of trade secrets, will not bar the plaintiff's anti-trust action." *Id.*

■ Therefore, the considerations that led the *Memorex* Court to reject a defense based on wrongful conduct directed against private parties are not present here. The plaintiffs in this action are engaged in wholly illegal enterprises which are directed against the public in violation of clear federal and state statutory criminal prohibitions, and as such, should not be able to assert or claim that they have rights protected by the anti-trust laws.

15. Plaintiffs, individually or through their agents, voluntarily promised the attorney general of the state of New Hampshire that they would cease selling pirated tapes in every state in which the sale of pirated tapes is a crime. This promise was made in order to induce the attorney general of the state of New Hampshire to forbear instituting criminal proceedings against plaintiffs. This is a separate and independent reason why plaintiffs do not have the standing or capacity to maintain this anti-trust action.

16. To the extent the complaint contains allegations with respect to the seeking or institution of governmental or judicial proceedings, the complaint refers to activities which are protected by the First Amendment to the Constitution and does not and cannot state a claim upon which relief can be granted.

17. Defendant is entitled to a summary judgment in its favor against plaintiffs jointly and severally.

The Clerk is ordered to enter judgment in accordance hereto forthwith.