**In re NAPSTER, INC. COPYRIGHT LITIGATION.**

**No. MDL 00–1369MHP.**
**No. C 99–5183MHP.**

United States District Court,
N.D. California.

Feb. 22, 2002.

Laurence F. Pulgram, Fenwick & West LLP, San Francisco, CA, for Napster, Inc.

Russell J. Frackman, Mitchell Silberberg & Knupp, Los Angeles, CA, Jacques M. Rimokh, Loeb & Loeb LLP, New York, NY, Matthew J. Oppenheim, Washington, DC, Stanley Pierre-Louis, Washington, DC, for A & M Records.

Howard E. King, King, Purtich, Holmes, Paterno & Berliner, LLP, Los Angeles, CA, for Metallica, Andre Young.

Albert H. Meyerhoff, Milberg Weiss Bershad Hynes & Lerach LLP, Los Angeles, CA, Reed R. Kathrein, Jason T. Baker, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, Hannah Bentley, Internet Lawyers Group, San Francisco, CA, for Casanova Records.

Matthew Katz, Malibu, CA, pro se.

Sam Birenbaum, Malibu, CA, for Matthew Katz.

Jeffrey G. Knowles, Coblentz Patch Duffy & Bass, LLP, San Francisco, CA, Aidan Synnott, Paul Weiss Rifkind Wharton & Garrison, New York, NY, Jacques M. Rimokh, Loeb & Loeb LLP, New York, NY, Stanley Pierre-Louis, Washington, DC, for Jerry Leiber.

Jeffrey G. Knowles, Coblentz Patch Duffy & Bass, LLP, San Francisco, CA, Aidan Synnott, Paul Weiss Rifkind Wharton & Garrison, New York, NY, for Mike Stoller, Frank Music Corp.

Stephen D. Rothschild, King, Purtich, Holmes, Paterno & Berliner, LLP, Los Angeles, CA, for E/M Ventures, Creeping Death Music, Aftermath Entertainment.

Kevin T. Baine, Thomas G. Hentoff, Williams & Connolly, Washington, DC, Matthew J. Oppenheim, Washington, DC, for Atlantic Recording Corp., Elektra Entertainment Group Inc., Sire Records Group, Inc., Warner Bros. Records Inc.

Matthew J. Oppenheim, Washington, DC, for Geffen Records, Inc., Interscope Records, Sony Music Entertainment, Inc., MCA Records, Inc., Island Records, Inc., Motown Record Co. L.P., Capitol Records, Inc., Universal Records, Inc., Polygram Records, Inc.

Barry I. Slotnick, Loeb & Loeb LLP, New York, NY, Matthew J. Oppenheim, Washington, DC, for BMG Music, Arista Records, Inc., Virgin Records America Inc.

David Henry Dolkas, Gray Cary Ware & Freidenrich, Palo Alto, CA, for EMUSIC.COM Inc.

Christopher Tayback, Quinn Emanuel Urquhart Oliver & Hedges LLP, Los Angeles, CA, for National Academy of Recording Arts & Sciences.

Alan Wilken, Thu M. Nguyen, Loeb & Loeb LLP, Los Angeles, CA, for Platinum Entertainment, Inc., Comptown Records, Inc., Estate of Eric Wright.

David A. Stall, Law Offices of David A. Stall, Irvine, CA, for Fonovisa, Inc.

David W. Quinto, Quinn Emanuel Urquhart Oliver & Hedges LLP, Los Angeles, CA, Daryl M. Crone, Redwood Shores, CA, for Academy of Motion Picture Arts and Sciences..

Ian K. Boyd, Harvey Siskind Jacobs LLP, San Francisco, CA, for Razor & Tie Direct, LLC, Razor & Tie Entertainment, LLC.

Ellen Papadakis, Thelen Reid & Priest LLP, San Francisco, CA, Michael S. Elkin, Thelen, Reid & Priest, L.L.P., New York, NY, for Rawkus Entertainment, LLC.

Charles E. Tillage, Joseph W. Cotchett, Jr., Cotchett Pitre & Simon, Burlingame, CA, Stephen A. Wieder, Kronish Lieb Weiner & Hellman, New York, NY, Laurence F. Pulgram, Fenwick & West LLP, San Francisco, CA, David Boies, Boies Schiller & Flexner LLP, Armonk, NY, Steven M. Cohen, Kronish Lieb Weiner & Hellman, LLP, New York, NY, Rebecca P.

Dick, Swidler Berlin Shereff Friedman, LLP, Washington, DC, Roy T. Englert, Jr., Alan E. Untereiner, Lawrence S. Robbins, Donald Russell, Robbins, Russell, Englert, Orseck & Untereiner, LLP, Washington, DC, Celia Goldwag Barenholtz, Kronish Lieb Weiner & Hellman, LLP, New York, NY, for Napster, Inc.

Edwin F. McPherson, McPherson & Kalmansohn, Los Angeles, CA, for Fred Drust.

Christopher J. Hunt, Bartko Zankel Tarrant & Miller, San Francisco, CA, for John Fanning.

Robert L. Eisenbach, III, Cooley Godward LLP, San Francisco, CA, Michael H. Page, Keker & Van Nest LLP, San Francisco, CA, for Hummer Winblad.

Joseph W. Cotchett, Cotchett Pitre & Simon, Burlingame, CA, for Hank Barry.

Timothy S. Teter, Cooley Godward LLP, Palo Alto, CA, for Bob Bozeman.

Ethan P. Schulman, Howard Rice Nemerovski Canady Falk & Rabin, San Francisco, CA, for Yosi Amram.

Annette L. Hurst, Howard Rice Nemerovski Canady Falk & Rabin, San Francisco, CA, for Shawn Fanning.

Jay Rosenthal, Berliner, Corcoran & Rowe, LLP, Washington, DC, for Recording Artists Coalition.

Neil Boorstyn, McCutchen Doyle Brown & Enersen, LLP, San Francisco, CA, pro se.

### MEMORANDUM AND ORDER

PATEL, Chief Judge.

The recording industry plaintiffs move for summary judgment against defendant Napster, Inc. ("Napster") for willful contributory and vicarious copyright infringement. In response, Napster requests that pursuant to Federal Rule of Civil Procedure 56(f) the court stay any decision on the merits to allow for additional discovery. Napster's 56(f) motion asks the court to determine whether additional discovery is necessary to decide if some of largest players in the music recording industry actually own the rights to the musical works for which they allege copyright infringement by Napster. The court is also asked to permit discovery to determine whether plaintiffs have misused their copyrights by attempting to control the market for the digital distribution of music. Having considered the arguments presented, and for the reasons set forth below, the court rules as follows.

## BACKGROUND

This action is one of several copyright infringement actions against Napster, an Internet service that facilitates the downloading of MP3 music files. *See In re Napster*, MDL 00–1369 MHP. Because this court and the Ninth Circuit have discussed the Napster service at length in prior orders, and because the parties are familiar with the Napster system, the court will limit this background section to information relevant to the current motions.

### A. *Procedural History*

On December 6, 1999, A & M Records and seventeen other record companies filed a complaint for contributory and vicarious copyright infringement against Napster. These eighteen parties can be collectively grouped into five major recording companies: BMG, Sony, EMI, Universal, and Warner. *See A & M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896, 908 (N.D.Cal.2000). Plaintiffs' complaint alleges that Napster knew of and failed to prevent its users' unauthorized reproduction and distribution of plaintiffs' copyrighted sound recordings. *See* Compl. ¶¶ 56–80. Plaintiffs claim ownership to a diverse catalog of artists including many of the industry's top-grossing artists from the

last five decades. *See* Compl., Exhs. A & B.

This court granted plaintiffs' request for a preliminary injunction in July 2000 and prohibited Napster from "engaging in or facilitating others in copying, downloading, uploading, transmitting, or distributing plaintiffs' copyrighted works." 114 F.Supp.2d at 927. Two days later, the Court of Appeals stayed the injunction. *See A & M Records, Inc. v. Napster, Inc.,* 2000 WL 1055915, *1 (9th Cir. July 28, 2000). In February 2001, the Ninth Circuit largely affirmed this court's findings of fact and grant of injunctive relief. *See A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004 (9th Cir.2001). A modified preliminary injunction was entered on March 5, 2001. *See A & M Records, Inc. v. Napster, Inc.,* 2001 WL 227083 (N.D.Cal. March 5, 2001). The court continued, with the aid of a technical expert, to monitor Napster's compliance with the preliminary injunction through August 2001.

In July 2001, plaintiffs advised the court of their intent to file a summary judgment motion. Napster objected, contending that more discovery was needed. The court instructed Napster that any remaining discovery issues should be raised in the context of a Rule 56(f) motion as a request that the court stay summary judgment to allow for discovery. Napster ignored this instruction, sending letters to the court requesting further discovery. *See* Letter re Discovery Issues Concerning Copyright Ownership from Kathryn Fritz, counsel for Napster, to Chief District Judge Marilyn Hall Patel (August 16, 2001); Letter re Discovery Issues Relating to Napster's Defenses from Kathryn Fritz, counsel for Napster, to Chief District Judge Marilyn Hall Patel (August 16, 2001). One letter addressed discovery requests regarding plaintiffs' ownership of the copyrighted works at issue and the other letter related to discovery necessary for Napster's mis-use and fair use defenses. Napster later categorized these letters as motions to compel. *See* Def.'s Rule 56(f) Mot. at 8.

Plaintiffs filed their motion for summary judgment on liability and willfulness on July 27, 2001. On September 10, 2001, Napster filed its opposition to plaintiffs' motion for summary judgment and a corresponding Rule 56(f) motion asking to stay summary judgment to allow for further discovery. A status conference to address discovery issues originally scheduled for September 11, 2001 was canceled and was not rescheduled. The court heard oral argument on plaintiffs' summary judgment motion and Napster's Rule 56(f) motion on October 10, 2001.

After oral argument on plaintiffs' and Napster's respective motions, the court ordered both parties to submit names for a Special Master to be appointed by the court to oversee possible discovery on the issue of ownership. *See* 10/15/01 Order. Subsequent to that order, the court granted leave to the Recording Artists Coalition ("RAC") to file an *amicus* brief addressing the issue of ownership and specifically, the work-for-hire doctrine. *See* 11/14/01 Order.

On January 16, 2002, the court held a status conference with Napster and plaintiffs. Also in attendance was Neil Boorstyn, the court-selected Special Master. The court ordered the parties to begin discovery on ownership and indicated its intent to issue an order allowing for discovery on copyright misuse and denying discovery as to fair use. The next day, the parties requested the court stay its rulings on these motions to permit time for them to resolve their disputes. The court granted the parties' request and stayed the litigation until February 17, 2002. The stay has now ended and the parties have advised the court that they are unable to resolve their disputes.

## B. Plaintiffs' Entry into the Digital Distribution Market

Also relevant to this order are plaintiffs' attempts to enter the market for digital distribution of music. In mid–2001, plaintiffs announced the formation of two joint ventures, MusicNet and press*play*. The aim of these joint ventures is to provide platforms for the digital distribution of music. MusicNet is a joint venture between three of the five record company plaintiffs—EMI, BMG, and Warner. MusicNet is also owned in part by RealNetworks (and possibly another entity). Press*play* is a venture between the other two plaintiffs—Sony and Universal.

In June 2001, Napster signed a licensing agreement with MusicNet, allowing Napster access to all of the copyrighted works licensed to MusicNet. *See* Barry Dec., Exh. 1. Prior to signing the MusicNet agreement, Napster was unable to obtain individual licenses from any of the recording company plaintiffs. *Id.* at ¶ 12. The MusicNet agreement explicitly limits Napster's ability to obtain individual licenses from any of the five plaintiffs, including the non-MusicNet plaintiffs—Sony and Universal—until March 2002. *Id.* at Exh. 1. The agreement also allows MusicNet to terminate the agreement within ninety days, even after March 2002, if Napster licenses content from any of the five recording companies other than through MusicNet. *Id.* Additionally, the agreement mandates a separate pricing structure for *any* content that Napster licenses from anyone other than MusicNet. *Id.* Napster has only provided the court with the MusicNet agreement and the court has no other information as to how MusicNet operates or exactly what content it will offer and to whom. Similarly, because Napster has not signed a licensing agreement with press*play*, the court has before it only information culled from the public record which reveals little about press*play*'s intended operations.

## LEGAL STANDARD

### A. Motion for Summary Judgment

Summary judgment shall be granted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [its] own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party discharges its burden by showing that the nonmoving party has not disclosed the existence of any "significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

### B. Motion for Stay of Summary Judgment

■ Upon a showing by the party opposing a motion for summary judgment that it "cannot for reasons stated present by affidavit facts essential to justify the party's opposition," the court may deny or continue the motion for summary judgment in order to permit that party an opportunity to obtain necessary discovery. Fed.R.Civ.P. 56(f). "Ordinarily, summary judgment should not be granted when

there are relevant facts remaining to be discovered, but the party seeking a continuance bears the burden to show what specific facts it hopes to discover that will raise an issue of material fact." *Continental Mar. v. Pacific Coast Metal Trades,* 817 F.2d 1391, 1395 (9th Cir.1987).

■■■■ A Rule 56(f) motion should be granted where the party opposing summary judgment makes a timely application that specifically identifies relevant information to be discovered, and there is some basis for believing that such information actually exists. *VISA Int'l Serv. Ass'n v. Bankcard Holders,* 784 F.2d 1472, 1475 (9th Cir.1986). Granting such a motion is particularly appropriate where the identified information is the subject of outstanding discovery requests. *Id.*

## DISCUSSION

Plaintiffs' motion for summary judgment asks that the court find Napster liable as a matter of law for both contributory and vicarious copyright infringement. Plaintiffs also move the court to rule as a matter of law that Napster's infringement of plaintiffs' copyrights was willful, entitling plaintiffs to increased statutory damages.

Napster opposes plaintiffs' motion on numerous grounds. As a threshold matter, Napster argues that summary judgment should be stayed pursuant to Federal Rule of Civil Procedure 56(f). Napster

contends that it cannot properly oppose plaintiffs' motion without further discovery related to plaintiffs' claims of copyright ownership and Napster's fair use and copyright misuse defenses. Second, Napster argues that even if it is not allowed further discovery, summary judgment should be denied because myriad issues remain in dispute.[1]

The court will now address the two threshold issues raised in Napster's Rule 56(f) motion which must be resolved before the court can consider the issue of Napster's liability: plaintiffs' ownership of the copyrights at issue and Napster's misuse defense. Finding that further discovery is necessary on both issues, the court grants Napster's 56(f) motion in part.[2]

### I. *Ownership*

In order to maintain an action for copyright infringement, plaintiffs must demonstrate that they own the copyrights for the works in question. In a strange turn of events, Napster now questions whether plaintiffs, who are responsible for at least 85% of all music sales, Noll Dec. (9/9/01) ¶ 20, actually own the rights to artists such as Elvis Presley, Nirvana, the Beatles, Jimi Hendrix, Michael Jackson, and, of course, the Grateful Dead.[3] These artists are among 213 whose works plaintiffs identify in their complaint ("Complaint

---

**1.** The issues for which Napster believes that there are disputed issues of fact are: plaintiffs' ownership of the copyrighted works at issue, copying of the works, fair use, the application of *Sony,* the extent of Napster's control over its system and its policing obligation, the extent of the Napster system's architecture, the sufficiency of plaintiffs' notices and Napster's removal of those works, application of the Digital Millennium Copyright Act, copyright misuse, and willfulness.

**2.** This order does not stay the entirety of plaintiffs' summary judgment motion. The

court will reach a determination on the other issues raised by plaintiffs, but intends that necessary discovery commence on the threshold issues of ownership and misuse. The court denies Napster's request for further discovery related to Napster's fair use defense, an issue that will be discussed in a subsequent order.

**3.** To the extent referenced in this order, the declarations of Hank Barry and Roger Noll are unsealed.

Works") as being infringed by Napster. *See* Compl., Exhs. A & B.

Plaintiffs provide evidence of ownership for the sound recordings listed in Schedule A and Schedule B of plaintiffs' complaint. The Schedule A works are post–1972 works whose copyright protection is derived from federal statute. For these works, plaintiffs provide documentation in the form of copyright certificates or applications for certificates. *See, e.g.,* McMullen Dec. (8/7/01), Exh. I. The Schedule B works are pre–1972 works, protected by state law. For these works, plaintiffs provide chain of title documentation to show the transfer of ownership rights from the respective artists to plaintiffs. *See, e.g., id.* at Exh. 5 (filed under seal).

Napster never actually argues that plaintiffs do not own the Complaint Works. Instead, Napster contends that it is not in a position to challenge plaintiffs' assertions of ownership because it has been denied crucial discovery. Napster points to a host of alleged deficiencies in plaintiffs' documentation that Napster cannot explore without additional discovery. Napster challenges plaintiffs' claims to authorship and the corresponding presumption of ownership; the evidentiary value of plaintiffs' copyright applications; the court's jurisdiction over works for which no copyright certificate exists; and the sufficiency of plaintiffs' proof of title. These challenges to plaintiffs' evidence of ownership are best understood by categorizing the works accordingly: (1) Schedule A works for which there is a copyright certificate listing plaintiffs as authors under the "work for hire" doctrine; (2) Schedule A works for which the author is someone other than plaintiffs; (3) Schedule A works for which a copyright application is pending; (4) Schedule A works for which no application has been filed; and (5) Schedule B works.

### A. Schedule A Works for Hire Listing Plaintiffs as Authors

 A copyright certificate establishes prima facie evidence of the validity of a copyright and of the facts in the certificate. 17 U.S.C. § 410(c). The presumption is rebuttable, and does not definitively resolve the ownership issue. *See Entm't Research Group, Inc. v. Genesis Creative Group, Inc.,* 122 F.3d 1211, 1217 (9th Cir.1997); *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1085–86 (9th Cir.1989); *Seiler v. Lucasfilm, Ltd.,* 808 F.2d 1316, 1321 (9th Cir.1986). Plaintiffs produced copyright certificates for the post–1972 works listed in Schedule A of plaintiffs' complaint. *See* Cho Dec. (8/3/01), Exh. 1; McMullen Dec. (8/7/01), Exhs. 1, 2; Pariser Dec. (8/6/01), Exhs. 1, 7; Stafford Dec. (8/2/01), Exhs. 1, 2; Vidich Dec. (8/1/01), Exh. 1.

Napster argues that the facial validity of the certificates is questionable at best and therefore justifies further discovery. Napster also contends that if discovery shows the certificates to be invalid, it is possible that plaintiffs do not have any ownership rights in the works. Plaintiffs respond that their certificates are valid because they own the works at issue regardless of the concerns raised by Napster. In order to evaluate the merits of the parties' arguments, the court will consider both bases upon which plaintiffs claim ownership: as authors and by assignment.

#### 1. Authorship and Works for Hire

Napster attempts to rebut the copyright certificates' presumption of ownership by questioning plaintiffs' claims of authorship. In particular, Napster argues that 133 of 144 Schedule A works are incorrectly designated as "works for hire". A "work for hire" is created when a specific type of work is specially commissioned from the artist by the hiring party or when the

artist is an employee of the party claiming ownership. 17 U.S.C. § 101. The "work for hire" designation is legally significant because the employer or the hiring party is considered to be the author of the work and is listed as such on the copyright registration certificate. 17 U.S.C. § 201.

■ Generally, an author has greater rights than one who acquires a copyright through an assignment, including the right to terminate all transfers of ownership after 35 years. 17 U.S.C. § 203. This right is non-transferrable and can only be exercised by the author or his/her heirs. *Id.* The author's right of termination is intended to counter the "unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." H.R.Rep. No. 94–1476, at 5740 (1976). Because the record company plaintiffs list the copyrights as works for hire, they are considered to be the authors and do not have to face the prospect of artists terminating plaintiffs' ownership rights after 35 years. The result is that plaintiffs effectively guarantee themselves 95 years of copyright ownership—a total of 60 additional years beyond what they would have if the artists were listed as the authors.[4]

### 2. *Challenges to Authorship*

■ As a threshold matter, Napster must have standing to challenge plaintiffs' authorship of the works at issue. Plaintiffs cite a multitude of cases that they characterize as holding that a third party does not have standing to challenge the

presumption of ownership created by a copyright certificate. *See, e.g., Magnuson v. Video Yesteryear,* 85 F.3d 1424 (9th Cir.1996). In fact, these cases are more limited than plaintiffs suggest. The cases hold that a third party does not have standing to challenge the presumption of ownership when plaintiffs claim ownership by assignment. *Id.* However, the case law is largely silent as how to treat third-party standing in instances of ownership by authorship. Ultimately, because ownership arises either through assignment or authorship, this silence dooms plaintiffs' argument. *See* 17 U.S.C. § 201. The third-party standing doctrine does not preclude this court from considering Napster's argument that the Schedule A Works are not "works for hire."

Napster mounts a two-fold challenge to plaintiffs' claims of ownership and authorship under the "work for hire" doctrine. First, Napster contends that plaintiffs' works cannot be "specially commissioned" works for hire under the plain reading of 17 U.S.C. § 101. "Works for hire" are considered "specially commissioned" when (a) the work is specially ordered or commissioned; (b) the parties agree in writing in advance that work will be a "work for hire"; and (c) when the work fits within one of nine statutorily drawn categories. 17 U.S.C. § 201. Sound recordings are not one of the nine listed works. *Id.*[5] This glaring omission in the statutory requirements suggests that plaintiffs' works cannot be "specially commissioned" works for hire.[6] Notably, the recording industry re-

---

**4.** This termination right is under the 1976 Copyright Act. 17 U.S.C. § 203. The 1909 Act—which applies to pre–1978 works—operates in a similar fashion, though the length of the term is different. 17 U.S.C. § 304.

**5.** The nine types of works are: a contribution to a collective work, part of a motion picture or other audiovisual work, a translation, a supplementary work, a compilation, an in-

structional text, a test, answer material for a test, or an atlas. 17 U.S.C. § 101(2). The statute also lists works that qualify as supplementary works.

**6.** Napster also challenges whether the other two elements of "specially commissioned" works are met. Because the court grants Napster's request for further discovery, the court does not reach these issues at this time.

cently tried and failed to add sound recordings to the list of works covered by the "specially ordered or commissioned" prong of the "work for hire" provision in section 101.[7]

Plaintiffs argue that sound recordings do, in fact, fall within these nine categories. *See* Pls.' Response to Amicus Br. of Recording Artists Coalition ("RAC") (filed 11/28/01) at 7–10. Because determination of this issue is beyond the scope of this order (and possibly prejudicial to the rights of recording artists, RAC Amicus Br. at 8), the court refrains from reaching the issue today, though it may be necessary to revisit it in the future.

Second, Napster challenges the other basis on which plaintiffs claim authorship. Napster argues that the absence of any evidence of an employment relationship between artists and plaintiffs precludes plaintiffs' claim of authorship under that prong of the "work for hire" doctrine. *See, e.g., Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (using common law agency principles to determine if an employment relationship exists). Plaintiffs admit that they have produced

no contracts with artists to demonstrate an employment relationship, but contend that the copyright certificates and the corresponding rebuttable presumption of ownership satisfy their burden of proof. *See* 17 U.S.C. § 410(c).

Napster has raised serious questions as to the validity of plaintiffs' claims of ownership as authors, bolstered by the arguments raised by *amicus curiae* RAC. In the absence of an alternative means of proving ownership, Napster's arguments and accompanying discovery requests satisfy the requirements for a Rule 56(f) stay. *See Continental Mar. v. Pacific Coast Metal Trades,* 817 F.2d 1391, 1395 (9th Cir.1987). However, authorship is only one possible avenue through which plaintiffs can establish ownership. If plaintiffs can demonstrate that they own the works by assignment, they will prevail on the issue of ownership and may demonstrate that additional discovery is either unwarranted or futile.

### 3. *Ownership by Assignment*

Plaintiffs argue that even if the relevant Schedule A works are not works for hire, plaintiffs own the rights to the works by

7. The actual history of this attempted revision is intriguing. The recording industry succeeded in amending the definition of work made for hire to include sound recordings by claiming the change would be only a technical amendment. When the amendment went into effect in 2000, there was a tremendous outcry—the rest of the recording community did not see the amendment as a technical change. *See, e.g.,* RAC Amicus Br. at Exh. 1. The change was repealed retroactively. P.L. No. 106–379 (enacted 2000). Today the definition of works made for hire includes the following text regarding this attempted amendment:

> In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by

section 1000(a)(9) of Public Law 106–113, nor the deletion of the words added by that amendment—
> (A) shall be considered or otherwise given any legal significance, or
> (B) shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination, by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106–113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

17 U.S.C. § 101.

assignment. A problem arises because plaintiffs attempt to use their copyright certificates, which list the works as works for hire, to establish a presumption of ownership *either* by assignment or authorship.[8]

As discussed above, the standing doctrine does not preclude Napster from challenging plaintiffs' ownership under the "work for hire" doctrine. However, plaintiffs now argue that Napster lacks standing to challenge the statutory presumption where ownership is based on assignment. The reasoning behind this argument is that any purported dispute over ownership by assignment is between the plaintiffs and the individual who created the works. To support their argument, plaintiffs rely on a line of cases exemplified by *Magnuson v. Video Yesteryear*, 85 F.3d 1424 (9th Cir.1996). *See also Radio Television Espanola S.A. v. New World Entm't. Ltd.*, 183 F.3d 922, 929 (9th Cir.1999); *Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir.1995); *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir.1982) In *Magnuson*, plaintiff asserted ownership by assignment and presented documentation registered with the Copyright Office as proof of the assignment. 85 F.3d at 1429. Defendant in *Magnuson* attempted to· overcome the presumption by arguing that despite the facial validity of the copyright certificate plaintiff failed to memorialize the assignment in writing as required by section 204(a). *Id.* The *Magnuson* court followed other courts in reasoning that where there is no argument between assignor and assignee, "it would be anomalous to permit a third party infringer to invoke [the writing requirement] against

the licensee." *Magnuson*, 85 F.3d at 1428 (*quoting Eden Toys*, 697 F.2d at 36).

The instant case presents an entirely different factual scenario from *Magnuson* and its progeny. Those cases centered on plaintiffs' claims to ownership by assignment where no dispute existed between assignor and assignee. The copyright certificates in the present action list plaintiffs as *authors*, not owners by assignment. *See, e.g.,* Cho Dec. (8/3/01), Exh. 1 (certificate for "Sheryl Crow" by Sheryl Crow listing A & M Records, Inc. as author). Nor is Napster challenging plaintiffs' failure to fulfill a statutory requirement or invoking a Statute of Frauds-like procedural rule to protect itself from the costs of its own wrongdoing. Instead, Napster is arguing that plaintiffs cannot simultaneously hide behind *Magnuson* to argue that Napster has no standing and continue to maintain that the works are "works for hire." In order for plaintiffs to establish ownership, the works must be, as a matter of logic, either "works for hire" *or* assigned to plaintiffs. ·

■ Plaintiffs respond that the presumption of ownership applies regardless of which box is checked on the copyright certificate. *But see* RAC Amicus Br. at 8. It is a well-established principle that errors in plaintiffs' copyright certificates do not automatically invalidate the certificates and their corresponding presumption of ownership. *See* 17 U.S.C. § 408(d) (allowing the filing of a supplementary registration to correct any errors); 2 David Nimmer & Melville B. Nimmer, *Nimmer on Copyright* § 7.20[A] (2001) ("Nimmer") (supplemental filing will not supercede the prior registration; nor will the original be

---

**8.** The court emphasizes that whatever determination is reached with respect to the presumption of ownership raised by plaintiffs' copyright certificates (and the corresponding presumption that all facts in the certificates are to be taken as true) only relates to the parties in this litigation and not to third parties (such as members of RAC) whose rights might otherwise be prejudiced.

expunged or canceled). "Absent intent to defraud and prejudice, inaccuracies in copyright registration do not bar actions for infringement." *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984). Napster has not alleged fraud nor does Napster contend that prejudice results from listing the works as works for hire. *See Testa v. Janssen*, 492 F.Supp. 198, 201 (W.D.Pa.1980) (false representation of authorship on copyright certificate when ownership was through assignment did not warrant application of unclean hands). Unless Napster can show that plaintiffs defrauded the Copyright Office in a manner that prejudiced Napster, the alleged inconsistencies in plaintiffs' certificates do not rebut the presumption of ownership.

Additionally, Napster asks the court look beyond the certificates despite any evidence that a single artist contests plaintiffs' right to sue for infringement. *See* RAC Amicus Reply Br. at 2 ("[RAC] takes no position on the scope of Plaintiff's [ownership] rights in these recordings—if any."); *Magnuson*, 85 F.3d at 1428. In this peculiar factual scenario, with widespread publicity and legally sophisticated artists appearing as *amicus curiae*, the fact that RAC takes no position on plaintiffs' ownership suggests that no such dispute exists (though RAC continues to dispute plaintiffs' claims to authorship).

The above discussion does not relieve the court's concern that refusing to allow any discovery on the issue of ownership converts the presumption of ownership into an irrebuttable one. That said, this court will not permit Napster to engage in a "fishing expedition." The advantage of the current statutory scheme is that plaintiffs need not produce mounds of documents in order to maintain an infringement action. Napster admits that plaintiffs control 85% of all music sales, Noll Dec. ¶ 20, and the court finds it highly unlikely that plaintiffs have failed to secure ownership interests in the works that are the foundation of their business. However, the court is equally reticent to allow plaintiffs, merely because of the quantity of music they control, to railroad Napster into potentially billions of dollars in statutory damages without adequately proving ownership.[9] The resulting tension between these two concerns requires the court to balance Napster's request for further discovery with the likelihood that such discovery will have any impact on plaintiffs' claims of ownership.

Without reviewing the agreements between artists and plaintiffs, it is impossible to determine if there is any merit to Napster's arguments. For example, if a contract characterizes a work as a "work for hire", or in the alternative transfers all rights to plaintiffs, ownership of the work is probably established. *See* 1 William F. Patry, *Copyright Law & Practice* 380–81 n. 89 (1994) ("[Artist/record company] contracts typically contain 'belt and suspenders' language transferring copyright in the event a work is found not [to] be a work made for hire."). If all of plaintiffs' contracts with artists (or a significant sampling thereof) are consistent in this regard, the court may find plaintiffs protected by the presumption of ownership despite inconsistencies in their copyright certificates. Consequently, the court orders plaintiffs to produce all documentation relevant to their ownership of the works listed as "works for hire." A Special Master appointed by the court will review the documentation and the court will order further discovery as necessary. The court

---

9. While the present motion addresses only the 213 Complaint Works, this action involves the alleged infringement of thousands of plaintiffs' works. The maximum statutory damages are $150,000 per act of infringement. *See* 17 U.S.C. § 504(c)(1).

specifically withholds any ruling on the "work for hire" issue, the scope of plaintiffs' rights, and the extent to which plaintiffs are protected by the presumption of ownership until further discovery is completed. If appropriate at a later point, the court will address the issues raised by the RAC's *amicus* brief and plaintiffs' responses thereto.

### B. *Schedule A Works Listing Author Other Than Plaintiffs*

 The above discussion does not address all of the works at issue. Some of the copyright certificates produced by plaintiffs are not "works for hire" and instead list a third party as author. Napster contends, and rightly so, that these certificates alone are insufficient to demonstrate ownership. The existence of a copyright certificate with someone else's name on it does not vest anyone other than the author with rights to the work. In order to show ownership, plaintiffs need to produce chain of title from the listed author to themselves. Plaintiffs have done this for at least some of the Schedule A recordings. For example, the certificate for Michael Jackson's "Thriller" lists Michael Jackson as the author. *See* Pariser Dec. (8/6/01), Exh. 1. The copyright claimant is listed as CBS, Inc. per agreement between author and owner. *Id.* Plaintiffs also provided documentation showing chain of title from CBS, Inc. to Sony. *Id.* at Exhs. 2 & 3 (the transfer of rights from CBS, Inc. to CBS Records, Inc. who merged with Sony, Inc.). For those certificates where the chain of title is insufficient, plaintiffs have not met their burden and must produce chain of title to demonstrate ownership.

### C. *Schedule A Works for Which an Application is Pending*

 Napster argues that the Schedule A works with pending registration applications are not entitled to the same rebuttable presumption as registered works.

Napster cites 17 U.S.C. section 410(c) for this proposition, but apparently failed to read the rest of the statute. The very next subsection, 17 U.S.C. section 410(d), states that "[t]he effective date of a copyright registration is the day on which an application ... [is] received in the Copyright Office." Hence, works with pending registrations will be given the benefit of the presumption of ownership.

### D. *Schedule A Works for Which No Application Has Been Filed*

 A copyright registration is a jurisdictional prerequisite to an infringement action. 17 U.S.C. § 411. For those fifteen works for which plaintiffs have not yet filed an application, this court lacks subject matter jurisdiction. *Id.* This does not prevent plaintiffs from bringing suit over these recordings once they are registered. *E.g., Sony,* 464 U.S. at 493 n. 44, 104 S.Ct. 774 ("[A]lthough an infringement action cannot be brought unless the work is registered, registration is not a condition of copyright protection. Copying an unregistered work still may be infringement") (citations omitted).

### E. *Schedule B Works*

 The Schedule B works are protected under state law. *See, e.g., Self–Realization Fellowship Church v. Ananda Church of Self–Realization,* 206 F.3d 1322, 1326 (9th Cir.2000). As a result, there is no registration requirement as with the post–1972 Schedule A works. Plaintiffs have attempted to prove ownership of the Schedule B works by producing redacted contracts between the artists and plaintiffs. *See, e.g.,* Pariser Dec. (8/6/01), Exh. 4 (Bruce Springsteen) (filed under seal). Many of the redactions make these contracts incomprehensible and a large number of the agreements reference earlier agreements that are not included. *Id.*

Plaintiffs also have been supplementing their chain of title by submitting some of the redacted portions of the relevant agreements.

 Napster argues plaintiffs cannot own the rights to the Schedule B Works because state law does not allow fixed works to be transferred. The argument is based on California Civil Code section 982 which says that *unfixed* sound recordings may be transferred. Cal.Civ.Code § 982. Napster reads this section to prohibit the transfer of fixed sound recordings. However, it is clear that section 982 is intended to fill a gap created by federal preemption and does not affect the transferability of fixed works. *Id.; see also* 2 Nimmer § 8C.03. Nor does Napster cite Civil Code section 980(a)(2) which provides that the "author of an original work of ownership consisting of a sound recording initially fixed prior to February 15, 1972 has an exclusive ownership therein." Cal.Civ. Code § 980(a)(2). Those ownership rights can be assigned. *See Self–Realization Fellowship Church,* 206 F.3d at 1326. The provision to which Napster refers, section 982(a), provides *additional* rights to transfer unfixed works. *See* 2 Nimmer § 8C.03 n. 20 (interpreting section 982(a) to preclude transfer "undoubtably would subvert its intent ... of giving added protection to [pre–1972] sound recordings.")

Napster does have a legitimate argument that some of the agreements produced for the Schedule B Works are illegible, incomplete, or overly redacted. Since plaintiffs bear the burden of showing chain of title, they must provide Napster with all of the necessary documents, redacting only proprietary information irrelevant to the issue of ownership.

## II. *Copyright Misuse*

 Napster argues that the court should deny summary judgment or stay the matter to allow for further discovery because plaintiffs are engaged in copyright misuse. Copyright misuse as a defense to an infringement action finds its origins in the equitable defense of unclean hands and is similar to the patent law defense of the same name. *See Morton Salt Co. v. G.S. Suppiger,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). This court and the Ninth Circuit dismissed Napster's misuse defense at the preliminary injunction stage, noting that copyright misuse is rarely a defense to injunctive relief and that there was not enough evidence at that stage to support a finding of misuse. *See A & M Records,* 239 F.3d at 1026–27, 114 F.Supp.2d at 923. Since those rulings, the factual and procedural landscape has changed significantly. The motion now before the court is for summary judgment, not preliminary injunctive relief. Additionally, the prior inapplicability of copyright misuse rested on the fact that none of the plaintiffs had granted licenses to Napster, let alone impermissibly restrictive ones. *See A & M Records,* 114 F.Supp.2d at 924. The evidence now shows that plaintiffs have licensed their catalogs of works for digital distribution in what could be an overreaching manner. *See, e.g.,* Barry Dec. (9/9/01) ¶ 13, Exh. 1. The evidence also suggests that plaintiffs' entry into the digital distribution market may run afoul of antitrust laws. *See generally* Noll Dec.

### A. *The Development of the Copyright Misuse Defense*

 The legitimacy of copyright misuse as a valid defense to an infringement action was in question for some time. *See Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 976 (4th Cir.1990) (describing the history of the misuse doctrine). For years, courts shied away from applying the doctrine, either refusing to recognize the defense, or finding it inapplicable on the facts. *Id.* Recently, courts have displayed

a greater willingness to find copyright misuse, employing two different, though interrelated approaches. The first approach requires a finding that plaintiff engaged in antitrust violations before the court will apply the doctrine of copyright misuse. *See, e.g., Saturday Evening Post v. Rumbleseat Press, Inc.,* 816 F.2d 1191, 1200 (7th Cir.1987).[10] The second approach, adopted by the Ninth Circuit, focuses on public policy and has been applied to a greater range of conduct than the antitrust approach. *See Practice Mgmt. Info. Corp. v. American Med. Assoc.,* 121 F.3d 516 (9th Cir.1997). *See generally* Brett Frischmann & Dan Moylan, *The Evolving Common Law Doctrine of Copyright Misuse: A Unified Theory and Its Application to Software,* 15 Berkeley Tech.L.J. 865, 880–902 (Fall 2000) (comparing antitrust and public policy-based misuse). Under the "public policy" approach, copyright misuse exists when plaintiff expands the statutory copyright monopoly in order to gain control over areas outside the scope of the monopoly. *See Practice Mgmt.,* 121 F.3d at 520; *Lasercomb,* 911 F.2d at 977–79 (copyright misuse "forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office"). The test is whether plaintiff's use of his or her copyright violates the public policy embodied in the grant of a copyright, not whether the use is anti-competitive. *See Practice Mgmt.,* 121 F.3d at 521. However, as a practical

matter, this test is often difficult to apply and inevitably requires courts to rely on antitrust principles or language to some degree. *See Lasercomb,* 911 F.2d at 977 (noting courts' "understandable" but misplaced reliance on antitrust principles).

The scope of the defense of copyright misuse has not been significantly tested in the Ninth Circuit. In fact, the court has been unable to find a single reported case that discusses beyond a mere citation the Ninth Circuit's adoption of the copyright misuse defense in *Practice Management. See, e.g., Sony Pictures Entm't, Inc. v. Fireworks Entm't Group, Inc.,* 156 F.Supp.2d 1148, 1156 (C.D.Cal.2001); *Pollstar v. Gigmania Ltd.,* 170 F.Supp.2d 974, 982 (E.D.Cal.2000). Nor did this court or the Ninth Circuit devote any discussion to *Practice Management* in previous rulings. *A & M Records,* 239 F.3d at 1026–7, 114 F.Supp.2d at 924. As a result, the doctrine of copyright misuse remains largely undeveloped, with little case law to aid this court in its inquiry.[11]

### 1. *Lasercomb America, Inc. v. Reynolds*

The Fourth Circuit was the first to explicitly recognize a copyright misuse defense, *Lasercomb America Inc. v. Reynolds,* 911 F.2d 970 (4th Cir.1990), though the Supreme Court previously acknowledged the possible existence of the defense. *See Morton Salt Co. v. G.S. Suppi-*

---

**10.** This approach labels certain activities as *per se* copyright misuse and uses a rule of reason approach for others. *See* Frischmann & Moylan, *The Evolving Common Law Doctrine of Copyright Misuse,* 15 Berkeley Tech. L.J. 865, 898. For those activities that fall within the rule of reason test, the court first asks whether the restraint is within the scope of the copyright monopoly. *Id.* If it is, then the conduct·is *per se* legal. *Id.* If not, the court then asks whether the activity as a whole promotes or restricts competition. *Id.* If the particular activity (e.g. licensing provi-

sion) restricts competition, then it is copyright misuse. *Id.*

**11.** In comparison, there is a substantial body of case law on patent misuse. *See, e.g., Morton Salt Co. v. G.S. Suppiger,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Patent misuse bases its analysis on antitrust principles and consequently is doctrinally analogous to antitrust-based copyright misuse. It is less helpful when employing the "public policy" analysis adopted by the Ninth Circuit.

*ger,* 314 U.S. 488, 494, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Lasercomb brought an action against defendant Holiday Steel, alleging that Holiday Steel copied its die-making software and sold it under a different name. *Lasercomb,* 911 F.2d at 971–2. On appeal, Holiday Steel did not dispute copying Lasercomb's software, but argued that Lasercomb misused its copyright by including a broad non-compete clause in its standard licensing agreement. *Id.* at 972. Lasercomb's agreement forbade a licensee from developing any kind of computer assisted die-making software. *Id.* at 973. The court held that Lasercomb's licensing agreement attempted to control any expression by Holiday Steel of the underlying idea embodied in Lasercomb's software. *Id.* at 979. Because the idea was outside the scope of the copyright monopoly, the court found that Lasercomb's licensing agreement constituted copyright misuse. *Id.*

 *Lasercomb* devised the following test for copyright misuse. The critical question is not whether an antitrust violation occurred, but "whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright." 911 F.2d at 978. Thus, a violation of antitrust law may be sufficient, but is not necessary, for copyright misuse. *Id.* at 978 ("[A] misuse need not be a violation of antitrust law in order to comprise an equitable defense to copyright.")

### 2. *Practice Management*

In 1997, the Ninth Circuit followed the reasoning of the Fourth Circuit and explicitly adopted a defense of copyright misuse. *Practice Mgmt. Info. Corp. v. American Med. Assoc.,* 121 F.3d 516 (9th Cir.1997). The American Medical Association ("AMA") licensed a copyrighted coding system to the Health Care Financing Administration ("HCFA"). *Id.* at 517–8. The agreement granted HCFA a royalty-free, non-exclusive license to use the AMA's coding system. *Id.* In return, HCFA promised not to use any other coding system and also promised to use its powers as a regulatory agency to require use of the AMA's system in programs administered by its agents. *Id.*

A separate dispute arose between Practice Management, the largest reseller of books of the AMA's coding system, and the AMA. *Id.* at 518. Practice Management argued in its action for declaratory relief that the AMA was misusing its copyrights because the licensing agreement between HCFA and the AMA was unduly restrictive. *Id.* The Ninth Circuit looked closely at the licensing agreement and sided with Practice Management. *Id.* at 521. In particular, the court held that the requirement that HCFA not use competing coding systems represented an expansion of the monopoly power of the AMA's copyright. *Id.* The court labeled this exclusivity clause the "controlling fact." *Id.* (copyright misuse is implicated by "the limitation imposed by the AMA licensing agreement on HCFA's rights to decide whether or not to use other forms as well").

The court did not investigate the extent of the AMA's market power or the actual effects on competition as it would have done in an antitrust analysis. *Id.* Instead, considering only the text of the agreement, the court merely noted the "apparent" adverse effects of the licensing agreement which "gave the AMA a substantial and unfair advantage over its competitors." *Id.; see also Alcatel USA, Inc. v. DGI Technologies, Inc.,* 166 F.3d 772, 793–94 (5th Cir.1999) (finding copyright misuse based on the text of the licensing agreement without proof of market power). The court reasoned that this use of a copyright to gain competitive advantage violates the public policy embodied in the

grant of a copyright. *Practice Mgmt.*, 121 F.3d at 521; *see also Lasercomb*, 911 F.2d at 978.

### 3. The Current State of Copyright Misuse

*Lasercomb* and *Practice Management*, along with other "public policy" cases, hold that copyright misuse exists when plaintiffs commit antitrust violations or enter unduly restrictive copyright licensing agreements. *See also Alcatel*, 166 F.3d at 793 (finding copyright misuse because the licensing agreement allowed defendant to "indirectly gain commercial control over products [defendant] does not have copyrighted"). It is also possible that others actions might violate the public policy behind the copyright laws. However, no courts has thus far articulated the boundaries of "unduly restrictive licensing" or when licensing or other conduct would violate the amorphous concept of public policy. *See Lasercomb*, 911 F.2d at 977.

Additional confusion arises because while courts have repeatedly stated that misuse is different from antitrust, they still rely on antitrust-like inquiries in determining what licensing agreements violate public policy.[12] Of the cases reviewed by the court, all mimic the *per se* rules of antitrust in holding that the relevant licensing agreements constitute copyright misuse because they are unduly restrictive *on their face*. *See, e.g., Practice Mgmt.*, 121 F.3d at 521. No court has yet found it necessary to investigate the effects of a licensing provisions by adopting an analysis similar to the antitrust rule-of-reason

approach but focusing instead on public policy. *Cf. Lasercomb*, 911 F.2d at 977–78 (rejecting the district court's use of a rule of reason analysis). As a result, the "public policy" misuse case law only helps to identify the egregious cases of misuse—when it is obvious that the particular licensing provision is overreaching. Currently, there is no guidance as to how to approach the more sophisticated cases where the text of the licensing provision itself is not dispositive.

Fortunately, this court need not answer these questions today. Instead, the court focuses on these issues to guide the parties in the evidentiary development of the scope of plaintiffs' alleged misuse.

### B. Napster's Allegations of Misuse

Napster alleges two bases for misuse. First, Napster contends that the licensing clauses in Napster's agreement with plaintiffs' joint venture, MusicNet, are unduly restrictive. In the alternative, Napster argues that even if that particular agreement is not unduly restrictive, plaintiffs' practices as they enter the market for the digital distribution of music are so anticompetitive as to give rise to a misuse defense.

### 1. The MusicNet Agreement

Napster contends that licensing requirements of plaintiffs' online venture, MusicNet, are unduly restrictive. MusicNet is a joint venture between three of the five record company plaintiffs (EMI, BMG, and Warner) to distribute digital music. This

---

**12.** In *Saturday Evening Post v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1200 (7th Cir. 1987), Judge Posner reiterated the Seventh's Circuit's belief that courts should rely on antitrust principles misuse claims:

'If misuse claims are not to be tested by conventional antitrust principles, by what principles shall they be tested? Our law is not rich with alternative concepts of mo-

nopolistic abuse; and it is rather late in the date to try to develop one without in the process subjecting the rights of patent holders to debilitating uncertainty.' This point applies with even greater force to copyright misuse, where the danger of monopoly is less.

*Id.* (quoting *USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 512 (7th Cir.1982))

joint venture anticipates obtaining licenses from the other two major labels (Sony and Universal) to distribute their catalogs of copyrighted music. *See* Noll Dec. ¶ 49; Barry Dec. ¶ 12. While Napster was unable to secure licenses from any of the individual plaintiffs, Napster reached an agreement with MusicNet that allows Napster to distribute the music from the catalogs of the three participating MusicNet plaintiffs and any other label that licenses its catalog to MusicNet. *See* Barry Dec. ¶ 14, Exh. 1.

Section 19.1 of the MusicNet agreement prevents Napster from entering into any licensing agreement with any individual plaintiffs until March 1, 2002. *See* Barry Dec., Exh. 1 at 15. The text of the agreement calls this space of time the "Initial Exclusivity Period." *Id.* The agreement also provides that even after March 2002 if Napster enters into any individual license with any of the major labels—i.e. the plaintiffs—including the MusicNet plaintiffs, MusicNet may terminate the agreement with ninety-day notice. *Id.* Additionally, section 6.3(a) lays out a pricing structure under which Napster will be charged higher fees if it fails to use MusicNet as its exclusive licensor for content. *Id.* at 7–8.[13]

It is unclear from the text of the agreement if the exclusivity provision operates to impermissibly extend plaintiffs' control beyond the scope of their copyright monopoly. In other misuse cases, the offending provision was exclusive and the "adverse effects of the licensing agreement [were] apparent." *Practice Mgmt.*, 121 F.3d at 521 (provision prevented defendant from using any compet-

itor's coding system); *Lasercomb*, 911 F.2d at 978 (defendant prohibited from producing any die-making software); *Alcatel*, 166 F.3d at 793–4 (software licensing provision effectively gave plaintiff control over uncopyrighted microprocessor cards). In contrast, the MusicNet provision is non-exclusive. Napster may obtain licenses from any of the record label plaintiffs, but may only do it through its agreement with MusicNet. *See* Barry Dec., Exh. 1 at 15. Despite this theoretical non-exclusivity, the provision effectively grants MusicNet control over which content Napster licenses. Napster's use of other music catalogs is predicated on MusicNet's securing an individual license to those catalogs. For example, under the MusicNet agreement, Napster no longer has the ability to obtain an individual license from Sony (a non-MusicNet plaintiff). Instead, Napster must rely on MusicNet to obtain a license to Sony's catalog. And, if MusicNet chooses not to obtain such a license, Napster is effectively prevented from using Sony's catalog. The result is an expansion of the powers of the three MusicNet plaintiffs' copyrights to cover the catalogs of the two non-MusicNet plaintiffs.

The MusicNet plaintiffs argue that this restriction is unimportant because they fully expect to obtain licenses from the other two majors recording companies.[14] That the restriction only applies until MusicNet contains licenses from Sony and Universal (non-MusicNet plaintiffs) or until March 2002 is irrelevant. *See Practice Mgmt.*, 121 F.3d 516, 521 ("The controlling

---

**13.** There are also allegations by Napster that the pricing structure of the MusicNet agreement prevents Napster from obtaining licenses from parties other than the five major record companies. *See* Barry Dec., Exh. 1.

**14.** Plaintiffs find themselves in a catch–22 because if MusicNet does not obtain these licenses, the licensing provision may be unduly restrictive, and if MusicNet does obtain licenses from the non-MusicNet plaintiffs, such cross-licensing implicates potential antitrust concerns. *See* Noll Dec. ¶ 110.

fact is that HCFA is prohibited from using any other coding system by virtue of the binding commitment . . . to use the AMA's copyrighted material exclusively."). The critical issue is that the agreement binds Napster to obtain licenses from MusicNet and not its competitors. Napster was caught in a position where its only options were to sign the agreement to gain access to the catalogs of the major record companies and thereby incur these restrictions in all their murkiness or to refuse to sign the agreement and have virtually no access to most commercially available music.

Though the agreement is troubling on its face, too many questions remain unanswered for the court to effectively rule on the issue. It is unclear to what extent it is appropriate to impute the actions of MusicNet to plaintiffs as MusicNet is a joint venture and technically remains a separate entity from plaintiffs. *See* Barry Dec. ¶ 12. However, plaintiffs cannot hide behind the shell of a joint venture to protect themselves from misuse claims. The court views with great suspicion plaintiffs' claims of ignorance as to MusicNet's activities. Surely the three parties to MusicNet discussed their joint venture before embarking on it. MusicNet did not suddenly appear full blown from the head of a fictitious entity.[15] The evidence suggests that plaintiffs formed a joint venture to distribute digital music and simultaneously refused to enter into individual licenses with competitors, effectively requiring competitors to use MusicNet as their source for digital licensing. If this proves

to be the case, the propriety of treating MusicNet as a separate entity is in question. *Cf. Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768–69, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

■ A few of plaintiff's arguments can be disposed of summarily. First, plaintiffs argue that Napster, as a party to the MusicNet agreement, cannot now challenge an agreement that it negotiated and subsequently signed. *Practice Management* explicitly holds that it is irrelevant who includes an exclusivity provision in an agreement. 121 F.3d at 521 (even if the exclusivity provision was included at HCFA's urging, it still prohibited HCFA from using competing coding systems). That Napster is both the party alleging misuse and a party to the offending agreement does not affect the court's analysis. *See Lasercomb,* 911 F.2d at 979 ("[T]he defense of misuse is available even if the defendants have not been injured by the misuse"; "The fact that appellants were not parties to one of Lasercomb's standard license agreements is inapposite to their copyright misuse defense."); *Morton Salt,* 314 U.S. at 494, 62 S.Ct. 402 ("It is the adverse effect upon the public interest of a successful infringement suit in conjunction with the patentee's course of conduct which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent.") [16]

■ Second, plaintiffs contend that because MusicNet is not yet in operation,

---

**15.** Although there may be a triumvirate with seemingly Zeus-like powers, the analogy is certainly imperfect. Perhaps some of the thunder god's brethren present a more appropriate object for comparison.

**16.** Plaintiffs' argument would have merit if there was any evidence that Napster introduced and negotiated for the exclusivity provision. In that scenario, it would be unseem-

ly to allow Napster to use the same provision as protection against infringement actions. Such a rule would create perverse incentives to artificially manufacture overreaching clauses as liability shields under the misuse doctrine. However, the evidence thus far shows that the relevant provisions were inserted at MusicNet's urging and not as an end-run around copyright laws by Napster. *See* Barry Dec. ¶ 19.

there is no ongoing misuse. This argument fails. The issue is not whether MusicNet is yet in operation, but whether the exclusivity provision in the agreement is active. Because Napster is already bound by the agreement, the restriction on Napster's ability to negotiate for licenses with individual plaintiffs is *currently* restricted.

 Third, plaintiffs contend that even if they are engaged in misuse, be it through restrictive licensing or antitrust violations, they should still be able to recover for infringement that occurred prior to the MusicNet agreement. Plaintiffs misunderstand the misuse doctrine. Misuse limits enforcement of rights, not remedies. *See Practice Mgmt.*, 121 F.3d at 520 n. 9 ("Copyright misuse does not invalidate a copyright, but precludes its enforcement during the period of misuse."). If plaintiffs are engaged in misuse, they cannot bring suit based on their rights until the misuse ends. *See Lasercomb*, 911 F.2d at 979 n. 22 ("Lasercomb is free to bring a suit for infringement once it has purged itself of the misuse."); *Morton Salt*, 314 U.S. at 492, 62 S.Ct. 402 ("Equity may rightly withhold its assistance ... by declining to entertain a suit for infringement, and should do so at least until it is made to appear that the improper practice has been abandoned and that the consequences of the misuse ... have been dissipated."). The doctrine does not prevent plaintiffs from ultimately recovering for acts of infringement that occur during the period of misuse. The issue focuses on when plaintiffs can bring or pursue an action for infringement, not for which acts of infringement they can recover.

### 2. *Antitrust Violations As Copyright Misuse*

Napster does not confine its argument to the particular provision of the MusicNet licensing agreement. Napster also argues that plaintiffs' entry into the digital distribution market is rife with actual anti-competitive effects and potential antitrust concerns.

 Antitrust violations can give rise to copyright misuse if those violations offend the public policy behind the copyright grant. *See Lasercomb*, 911 F.2d at 977 ("[A]ntitrust law is the statutory embodiment of that public policy"). However, generalized antitrust violations will not suffice. Napster must establish a "nexus between ... alleged anti-competitive actions and [plaintiffs'] power over copyrighted material." *Orth–O–Vision, Inc. v. Home Box Office*, 474 F.Supp. 672, 686 (S.D.N.Y.1979).

Napster's arguments are based primarily on the declaration of Roger Noll, a Stanford professor who specializes in antitrust economics and the recording industry. *See* Noll Dec., Exh. 1. Based on Dr. Noll's review of the MusicNet agreement and facts in the public record, Napster alleges that there are a host of anti-competitive behaviors by the plaintiffs that violate antitrust laws. *See generally* Noll Dec. Dr. Noll concludes that plaintiffs' joint ventures, MusicNet and press*play*, have anti-competitive features and facilitate collusive activity between plaintiffs. *Id.* at ¶¶ 66–83. Dr. Noll further asserts that plaintiffs engage in vertical foreclosure of the digital distribution market through retail price squeezes, raising costs through licensing provisions, refusals to deal, and exclusive dealing. *Id.* at ¶¶ 94–102. Dr. Noll also discusses myriad other behaviors that Napster alleges provide a sufficient nexus to the copyright monopoly to invoke the doctrine of copyright misuse. *See generally id.*

For example, Dr. Noll alleges that plaintiffs' joint ventures, MusicNet (Warner, EMI and BMG) and press*play* (Sony and Universal), allow plaintiffs to engage in retail price-coordination. *See,* Noll Dec.

¶ 70. Plaintiffs hotly dispute this allegation and noted at oral argument that both MusicNet and press*play* were designed with numerous protections (none of which are in the record) to avoid implicating antitrust concerns. The current record on the licensing practices of these joint ventures and their operations is negligible. However, even a naif must realize that in forming and operating a joint venture, plaintiffs' representatives must necessarily meet and discuss pricing and licensing, raising the specter of possible antitrust violations. *See* Noll Dec. ¶ 77. These joint ventures bear the indicia of entities designed to allow plaintiffs to use their copyrights and extensive market-power to dominate the market for digital music distribution. *Cf. Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 24, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (noting that CBS had a "real choice" as to whether it wanted to obtain individual licenses). Even on the undeveloped record before the court, these joint ventures look bad, sound bad and smell bad.

Of course, plaintiffs object strenuously to the Noll Declaration and have filed a lengthy separate evidentiary objection accusing Dr. Noll of everything from speculation to mistake to deliberate misrepresentation.[17] Plaintiffs argue that much of Dr. Noll's declaration refers to activities that have no relationship to plaintiffs' ownership of copyrights. For example, plaintiffs contend that it should not matter for the purposes of copyright misuse if plaintiffs engage in price fixing because the behavior is unrelated to the manner in which plaintiffs use their copyright monopoly. *See Orth–O–Vision*, 474 F.Supp. at 686. However, there can be no doubt that price-fixing carries antitrust and public policy considerations that may be relevant to misuse. While further evidentiary de-

velopment may sustain plaintiffs' argument, on the current record defendants have demonstrated a sufficient nexus to allow for further discovery.

■■■ Plaintiffs also contend that Dr. Noll merely speculates about potential antitrust violations. They point to his frequent use of "if", "maybe", "potentially" and "possibly" as a demonstration of the weakness of Napster's evidence of anticompetitive conduct. However, plaintiffs fail to address the fact that the speculative nature of Napster's argument is a direct result of Napster's lack of discovery on the issue of misuse. Finally, plaintiffs correctly contend that prior antitrust violations cannot give rise to a misuse defense. *See Practice Mgmt.*, 121 F.3d at 520 n. 2 ("Copyright misuse ... precludes [ ] enforcement *during the period of misuse.*") (emphasis added). The court interprets any discussion of prior anti-competitive behavior as background to the industry and not as part of Napster's misuse defense.

Napster has raised serious questions with respect to possible copyright misuse, based on both the MusicNet agreement and plaintiffs' possible antitrust violations in their entry into digital music delivery. Nor does the court believe Napster's motion to be merely a fishing expedition to avoid summary judgment. The same conduct by plaintiffs that Napster alleges gives rise to copyright misuse is currently under investigation by the Department of Justice. *See* Pulgram Dec. (9/10/01), Exh. 20. For the time being, however, neither side has sufficiently developed the factual and legal bases for their arguments. The evidence presently before the court suggests that Napster needs further discovery in order to sufficiently oppose plaintiffs' motion for summary judgment. As such,

---

**17.** Because more discovery is necessary before reaching a final decision on Napster's

misuse defense, the court does not rule on plaintiffs' objections at this time.

the court grants Napster's Rule 56(f) motion with respect to its misuse defense. Once such discovery is completed, both sides will have an opportunity to rebrief the issue of misuse, incorporating any new discovery and focusing on legal issues that were not adequately briefed earlier.

## C. *Unclean Hands*

Plaintiffs argue that even if Napster makes a threshold showing that further discovery is necessary, Napster's unclean hands bar a misuse defense. Plaintiffs contend that as an equitable doctrine copyright misuse may not be asserted by one who asks the court to shelter them from the repercussions of their unconscionable and unjust behavior. Napster responds that there is no "unclean hands" bar to copyright misuse, that its hands are not dirty, and that even if Napster has unclean hands, plaintiffs' alleged misuse is so egregious that the court should allow Napster's defense.

### 1. *The Existence of an Unclean Hands Bar to Misuse*

The court begins by noting that there is almost no case law discussing an unclean hands bar to copyright misuse. The only case that provides clear support for plaintiffs' argument is *Atari Games Corp. v. Nintendo of America, Inc.,* 975 F.2d 832, 846 (Fed.Cir.1992) ("The Ninth Circuit has noted that doctrine of unclean hands can also preclude the defense of copyright misuse") (citing *Supermarket of Homes v. San Fernando Valley Bd. of Realtors,* 786 F.2d 1400, 1408 (9th Cir.1986)). However, subsequent cases point out that *Atari's* citation to *Supermarket of Homes* does not support the general proposition that unclean hands bar a misuse defense. *See Alcatel,* 166 F.3d at 795 (also finding unpersuasive a "smattering of other courts [that] have proposed [an unclean hands] bar to the use of an equitable defense"). Nor does *Atari* sufficiently explain why

Atari's inequitable conduct rendered inapplicable their claim of misuse. *See Atari,* 975 F.2d at 846. Despite these concerns, *Atari* is not entirely without support. One of the pre-eminent treatises on copyright law is in accord with plaintiffs' argument. *See* 4 Nimmer § 13.09[B] at 13–295 (copyright misuse defense "should be denied ... when the defendant has been guilty of conduct more unconscionable and unworthy than the plaintiff's."). However, plaintiffs do not develop their argument beyond these few citations and fail to convince the court that an unclean hands bar serves the general equitable principles of the misuse doctrine.

Napster, while failing to distinguish *Atari,* briefly argues that the court should be guided by the reasoning of *Alcatel.* 166 F.3d at 790. The Fifth Circuit held that "the deceptive practices used by [defendant] ... left it with very dirty mitts. Nevertheless, this finding is irrelevant given the particular posture of this case." 166 F.3d at 794. *Alcatel* drew a distinction based on the type of relief sought. If plaintiffs seek equitable relief (as was the case in *Alcatel* ), then "the defendant's improper behavior serves as no bar to its equitable defenses." *Id.* at 794 n. 92 (quoting *United Cities Gas Co. v. Brock Exploration Co.,* 995 F.Supp. 1284, 1296 n. 11 (D.Kan.1998)). If plaintiff "requests exclusively legal relief, the defendant's unclean hands may preclude it from advancing equitable defenses." *Id.*

This reasoning squares with the principle "that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Plaintiffs used this court's open doors to obtain

an injunction that eventually forced Napster to disable file-sharing entirely. Because plaintiffs have invoked this court's equitable powers (and it now appears that plaintiffs may have since sullied their hands with misuse), Napster should be entitled to assert equitable defenses. *See Alcatel,* 166 F.3d at 794 n. 92; *United Cities,* 995 F.Supp. at 1296 n. 11. Once plaintiffs used equity as a sword to prevent Napster's continued infringement, they lost the right to employ the unclean hands bar to shield themselves from the consequences of their own potentially inequitable behavior. *See United Cities,* 995 F.Supp. at 1284 (unclean hands is "not actually a defense, but a concept designed to protect the court from becoming a party to the transgressor's misconduct"). The situation would be markedly different had plaintiffs sought only legal relief. In such a case, Napster would be the party trying to bring equity into play and its unclean hands might bar equitable defenses.

This court finds *Alcatel* persuasive and notes its own concerns about applying an unclean hands bar *specifically* to misuse (as opposed to laches or some other equitable defense). Copyright misuse is distinguishable from other equitable defenses in that it focuses on harm to the public as well as harm to the court's integrity. *See Precision Instrument,* 324 U.S. at 815, 65 S.Ct. 993 ("[W]here a suit in equity concerns the public interest as well as the private interests of the litigants [unclean hands] assumes even wider and more significant proportions"). The court cannot fail to note that plaintiffs' alleged misuse harms many more parties than just Napster. *See Morton Salt,* 314 U.S. at 493, 62 S.Ct. 402 ("Undoubtedly 'equity does not

demand that its suitors shall have led blameless lives', but additional considerations must be taken into account where maintenance of the suit concerns the public interest as well as the private interests of suitors.") (citations omitted); *Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349–50 (9th Cir.1963) ("In the interests of right and justice the court should not automatically condone the defendant's infractions because plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing the injury to the public."). To refuse to allow Napster to maintain a misuse defense risks letting plaintiffs' alleged misconduct and the resultant public harm continue unabated. *See Morton Salt,* 314 U.S. at 494, 62 S.Ct. 402; *Republic Molding,* 319 F.2d at 350; *cf. Precision Instrument,* 324 U.S. at 815, 65 S.Ct. 993 ("For if an equity court properly uses the maxim to withhold its assistance . . . it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public."). If the ultimate concern of the misuse doctrine is to ensure public access to the fruits of creative energies, then unclean hands should not bar a misuse defense.[18]

## 2. *Balancing the Equities*

 Assuming *arguendo* that an unclean hands bar exists, Napster should still be allowed discovery necessary to assert a misuse defense. The application of unclean hands requires the court to balance the respective positions of the parties. *See, e.g., Republic Molding,* 319 F.2d at 350; *Tempo Music, Inc. v. International Good Music, Inc.,* 1964 WL 8106, 1964

---

**18.** Because the court focuses on harm to the public as a relevant factor in whether an unclean hands bar to misuse exists, it logically follows that the distinction between whether plaintiffs are seeking legal or equitable relief is less significant than suggested by *Alcatel.* It is possible that the public interest implicated by a misuse defense might justify allowing the defense even where defendants have unclean hands and plaintiffs are seeking solely legal relief.

U.S.Dist. LEXIS 7876 at *6 (W.D.Wash. 1964) (even if plaintiffs had violated antitrust law, "their violations are so minimal and the violations of the defendants so unconscionable that plaintiffs should not be deprived of the right to maintain these actions for the deprivation of their property.")

At oral argument, each side spent a great deal of energy trying to convince the court that the other side had dirtier hands. The evidence before the court supports the argument that Napster infringed plaintiffs' copyrights for nearly two years, resulting in what could be millions of acts of unauthorized copying. Plaintiffs also contend that Napster continued to disregard plaintiffs' rights even after the Ninth Circuit made it abundantly clear that Napster would probably be liable for contributory and vicarious infringement. *See A & M Records,* 239 F.3d at 1027; *see also Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1170 n. 43 (1st Cir.1994) (violation of valid injunction against further infringement was "blatantly inequitable conduct" which could deprive infringer of the misuse defense even if it could still maintain affirmative antitrust claims); *Pearl Music Co., Inc. v. Recording Indus. Assoc. of Am., Inc.,* 460 F.Supp. 1060, 1067–68 (C.D.Cal. 1978) (plaintiff tape-pirates lacked standing to bring antitrust claims since their copyright-infringing business was illegal). With the possibility that Napster's infringement was willful, Napster's hands are abundantly dirty.[19]

Despite Napster's unclean hands, any balancing of equities must account for the fact that the Napster service is no longer functioning and thereby not infringing. Rofman Dec. (9/9/01) ¶ 13. When it became apparent to Napster that it could not comply with this court's injunction, it disabled the ability of its users to share music files. *Id.* Nor is the injury caused by Napster non-compensable. Plaintiffs are well-situated to recover for Napster's past behavior, and concerns about possible future harm are alleviated by this court's injunction (which remains in effect). Additionally, there are no allegations that the public is continuing to be harmed by Napster's behavior.

In contrast, plaintiffs' allegedly inequitable conduct is currently ongoing and the extent of the prospective harm is massive. If Napster is correct, plaintiffs are attempting the near monopolization of the digital distribution market. The resulting injury affects both Napster and the public interest. *See Republic Molding,* 319 F.2d at 349–50 ("[T]he extent of actual harm caused by conduct in question, either to defendant or to the public interest, is a highly relevant consideration.") The timing of the alleged inequitable conduct is also relevant. Plaintiffs began their entry into the digital distribution market only shortly before successfully forcing Napster to shut down all file-sharing. *See* Barry Dec. ¶ 14. This coincidence leaves the court reticent to bar further inquiry by Napster into plaintiffs' misuse.

While both parties appear to have "dirty mitts", the court cannot deny the public interest in allowing Napster's misuse defense. Ultimately, the decision whether to apply unclean hands rests in

---

**19.** The relative inequitableness of Napster's conduct is tied to this court's determination of Napster's willfulness. Logically, the mere act of infringement is not enough for unclean hands because such a rule would bar *any* infringer, innocent or intentional, from asserting misuse. Unclean hands must result from some particularly reprehensible conduct. *See, e.g., Atari,* 975 F.2d at 846 ("Atari lied to the Copyright Office in order to obtain the copyrighted [software] program."). As a general matter, the same conduct often supports a finding of willfulness.

the court's discretion. *See, e.g., Precision Instrument*, 324 U.S. at 815, 65 S.Ct. 993; *Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 478 (9th Cir.1969). The court is not "bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Precision Instrument*, 324 U.S. at 815, 65 S.Ct. 993 (quoting *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245–46, 54 S.Ct. 146, 78 L.Ed. 293 (1933)). On the state of the current record, the court cannot determine where the greater harm and misconduct lies. At this time, the potential for public injury and the fact that Napster has shut its doors to infringement justifies allowing Napster to assert a misuse defense to obtain additional discovery.

*CONCLUSION*

It is HEREBY ORDERED that DEFENDANT'S Rule 56(f) motion is GRANTED IN PART. The court has already taken up with the parties discovery to be permitted and a method of proceeding with respect to the issue of ownership. The parties shall submit within one (1) week of this order a joint proposed order outlining the procedures for the Special Master. Plaintiffs shall provide both redacted and unredacted documents relating to ownership to Special Master Neil Boorstyn within two (2) weeks of the date of this order. With respect to misuse discovery and further ownership discovery, a status conference will be held on March 27, 2002 at 10 a.m. The parties shall submit a joint status conference statement and plan for discovery ten (10) days prior to the status conference.

IT IS SO ORDERED.